Vonnie M. Hicks v. Commissioner. Vonnie M. Hicks and Jessie G. Hicks v. Commissioner.
Hicks v. Commissioner
Docket Nos. 53001-53003.
United States Tax Court
T.C. Memo 1957-24; 1957 Tax Ct. Memo LEXIS 232; 16 T.C.M. (CCH) 108; T.C.M. (RIA) 57024; January 31, 1957
*232 1. The Commissioner determined the petitioner's net income by the net worth method for the years 1940 to 1949, inclusive, and by making specific adjustments to the reported income for the years 1950 and 1951. The petitioner contends that the net worth method should be used for all of the years because his books and records were inadequate and the change in method causes a distortion of income between years. Held, the Commissioner's method of determining income is reasonable and is upheld. 2. The petitioner contends that certain items in the net worth computation are incorrect. Held, that the Commissioner's determination as to cash on hand, liabilities, inventories, and living expenses is erroneous and subject to adjustment and adjustments are made herein, but no credit should be given to petitioner for income belonging to him and derived from his assets although reported by his wife on a separate return. 3. The Commissioner increased the petitioner's professional income for 1950 and 1951, and determined that certain other amounts received in 1950 were compensation for services rendered. Held, that increases in professional income are approved subject to certain adjustments but that *233 other amounts received in 1950 were loans subject to an indemnification agreement and not income. 4. The Commissioner disallowed petitioner's son as a dependency exemption for several of the years here involved on the ground that the petitioner did not furnish over one-half of his support and also disallowed (son's) wife as a dependent during 1946 on the ground that she filed a joint return with the son. Held, that the Commissioner's action in disallowing these exemptions was proper under the facts and he is sustained. 5. Held, that petitioner fraudulently failed to report part of his professional income for the years 1947, 1948, 1949, 1950, and 1951, and that a part of the deficiencies for each of those years was due to fraud with intent to evade the tax. Held, further, that the Commissioner has not sustained his burden of proof as to fraud for the taxable years 1940 to 1946 and his additions to the tax for those years under section 293(b), Internal Revenue Code of 1939, are not sustained. 6. Statute of limitations. - The petitioner has pleaded the statute of limitations as a bar to the assessment and collection of the deficiencies for all of the years 1940 to 1948, inclusive. He *234 concedes that the statute of limitations does not bar the years 1949, 1950, and 1951. Held, the Commissioner has not sustained his burden of proof that petitioner's returns for 1940 to 1946, inclusive, were false and fraudulent with intent to evade taxes, and the deficiencies for those years are barred by the statute of limitations. Held, further, petitioner's returns for 1947 and 1948 were false and fraudulent with intent to evade taxes and the assessment and collection of the deficiencies for those years are not barred by the statute of limitations. 7. Estimated tax. - Held, additions provided for in section 294(d)(1)(A) and section 294(d)(2), Internal Revenue Code of 1939, are sustained. 8. Self-employment tax. - Held, that petitioner had self-employment income and is liable for self-employment tax provided in section 480, Internal Revenue Code of 1939. Edwin P. Friedberg, Esq., Raleigh Building, Raleigh, N.C., for the petitioners. Ralph V. Bradbury, Jr., Esq., and Paul J. Weiss, Jr., Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent has determined deficiencies in income taxes and additions thereto, as follows: Vonnie M. Hicks, Docket No. 53001
Taxable
Additions to Tax
Year
Income Tax
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
1940
$ 1,055.72
$ 587.88
1941
1,352.47
676.24
1942
9,932.21
4,966.11
1943
11,268.65 [1] *235 *294 5,634.33
$ 886.72
1944
12,282.58
6,141.29
753.29
1945
15,158.55
7,579.28
1,160.02
1946
18,491.07
9,742.21
991.82
1947
10,085.33
5,414.45
$1,157.04
694.23
Vonnie M. Hicks and Jessie G. Hicks
Docket No. 53002
1948
8,975.02
4,930.88
542.63
1949
10,859.56
5,429.78
769.71
Vonnie M. Hicks and Jessie G. Hicks
Docket No. 53003
1950 [2]
15,336.48
7,668.24
931.32
1951 [2]
7,895.16
3,947.58
564.42
These proceedings were consolidated. The respondent has computed the petitioners' taxable income by the net worth and expenditures method for the years 1940 to 1949, inclusive, and by making specific adjustments to the reported net income for the years 1950 and 1951. Hicks' individual income tax returns (including joint returns with Jessie for the years 1940, and 1948 to 1951) show the following amounts of net income and income taxes: Taxable
Year
Net Income
Income Taxes
1940
$12,058.14
$ 685.01
1941
14,385.64
2,272.27
1942
14,135.66
3,541.98
1943
13,764.54
3,870.78
1944
13,252.77
3,308.63
1945
21,411.03
7,575.18
1946
14,989.88
3,045.85
1947
13,640.28
3,695.80
1948
13,376.39
7,982.12
1949
20,869.69
3,969.02
1950
21,701.90
4,185.50
1951
22,914.91
5,592.82 Hicks paid additional income taxes, as follows: Taxable
Year
Additional Taxes
1940
$120.03 RAR adjustment
1946
993.35 RAR adjustment
1947
743.56 Amended return
1948
886.74 Amended return
In addition, Jessie Hicks filed separate individual income tax returns for the years 1941-1943 and 1945-1947. See Issue 2(e), infra, pp. 20-21, 37-38. *236 These returns are not involved except in that Hicks is claiming credit for the income returned by her. In the deficiency notices the following amounts have been determined as additional income: Year
Amount
Year
Amount
1940
$ 6,776.43
1946
$34,463.37
1941
3,916.24
1947
21,635.34
1942
18,296.61
1948
27,107.36
1943
19,650.24
1949
25,761.03
1944
20,454.89
1950
32,396.55
1945
24,376.75
1951
16,846.25
The amounts for most of the years have been affected by various stipulations and by an amendment to the answer for the years 1950 and 1951. The respondent, in addition, has disallowed certain dependency exemptions for several of the years involved and has imposed the self-employment tax for the year 1951. Respondent's computation of the self-employment tax contained in his deficiency notice is as follows: Self-employment income per return
NONE
Additional net earnings from self-
employment: Earnings from optical laboratory
$17,680.10
Corrected self-employment income
$17,680.10
Self-employment tax (2 1/4% of
$3,600.00)
$ 81.00
The petitioners contend: (1) that their income should have been computed by the net worth and expenditures method for all of the years involved; (2) and (3) that the net worth computation for the years 1940 *237 to 1951, inclusive, submitted by the petitioners at the hearing of these proceedings more nearly reflects their income and should be accepted rather than the respondent's determinations; (4) that certain dependency exemptions that were claimed by petitioner and disallowed by respondent should be allowed; (5) that the additions to the tax provided for in section 293(b), Internal Revenue Code of 1939, were improperly determined; (6) that the statute of limitations precludes the assessment and collection for the years 1940 to 1948, inclusive; (7) that the additions to the tax provided for in section 294(d)(1)(A) and section 294(d)(2), Internal Revenue Code of 1939, were improperly determined; and (8) that the self-employment tax for the year 1951 was improperly determined. Findings of Fact A stipulation of facts, together with numerous joint exhibits attached thereto, has been filed and is incorporated herein by reference. The petitioners, Vonnie M. Hicks (hereinafter referred to as Hicks or petitioner) and Jessie G. Hicks (hereinafter referred to as Jessie), husband and wife, are residents of North Carolina and filed individual income tax returns with the then Collector of Internal Revenue *238 for the District of North Carolina, as follows: Year
Joint Return
Vonnie M. and
Jessie G. Hicks
1940,
1948-1951
Separate Return
Vonnie M. Hicks
1941-1947
Separate Return [1]
Jessie G. Hicks
1941-1943,
1945-1947
Amended returns were also filed for the years 1947 and 1948, and additional taxes were paid. Petitioners were married in 1919 and have three children. Hicks is a surgeon and has limited his practice to ophthalmology. After completing his medical training he joined the medical firm of Lewis, Battle and Wright in Raleigh, North Carolina, in 1921. The firm had been established for about 40 years and had a substantial practice. Shortly thereafter, the firm became Lewis, Battle, Wright and Hicks and he received a 25 per cent interest therein. Within a year Lewis and Battle died and Hicks acquired a 50 per cent interest in the firm. Since then other doctors have been with the firm at various times. During the years in question the firm was known as Wright, Hicks and Powers; Wright, Hicks, Powers and Wright; and Wright, Hicks and Wright. 1. Method of Determining *239 Income When Hicks joined the firm in 1921, there was an established method of bookkeeping and that system has remained substantially intact throughout the years involved. Neither Hicks nor any of the doctors made any entries in the books. Such entries as were made were made by those who had been placed in charge of the books and records. During the years in question Evelyn Lucier (hereinafter referred to as Evelyn), a secretary for the doctors, principally handled the books. Elsie Dunn (hereinafter referred to as Elsie), who was hired in the latter part of 1941 as a secretary, was familiar with the books and participated in handling them throughout most of the years in question. In 1939, the firm established an optical laboratory (hereinafter referred to as the Lab) in order to avoid the "kickback" system and to provide their own patients with eyeglasses. Later the Lab did repair work and made glasses for persons who were not patients of the doctors. Hicks did a major part of the eye work that came to the firm. He purchased the equipment and financed the Lab; the Lab belonged to him. The Lab was first located in a small room on the sixth floor of the Professional Building, across *240 the hall from the doctors' offices. After a few years the Lab was moved to the basement of the same building because of crowded quarters. Leon Byrum, an experienced optician, was employed to manage the Lab from its inception until 1948. Hicks' son, Greig Hicks (hereinafter referred to as Greig) began working in the Lab in 1946 and managed the Lab from the time Byrum left in 1948, throughout the rest of the years in question. The books and records for the medical firm were kept in the doctors' offices. There was a cash book in which all of the receipts were supposed to be entered along with the name of the patient and the name of the doctor who treated that patient. If any of the receipts represented a payment for glasses, that amount was to be noted in a separate column to the left. There were patient-record cards with medical information on one side and a record of charges and payments on the other side. All of the cash receipts were handled by the office staff. The patients would make their payments to them; they would open the mail and record any payments that were made in that manner. The cash book was totaled daily. The cash on hand was also totaled and it was supposed to agree *241 with the total in the cash book, but at times there were minor discrepancies. There was no control over cash to insure that the discrepancies were accounted for. The employees frequently borrowed funds from the cash on hand; also the employees and the doctors cashed their personal checks from the cash on hand. At sometime in the 1940's, the record does not make clear when it was, but after Evelyn had been employed and put in charge of the books and records of the medical firm, Hicks directed Evelyn to withhold $100 per week of the amounts collected from his patients and to give this to him each week. Evelyn would record all amounts collected on the patient-record cards but would not enter the withheld amounts in the cash book or deposit them in the bank. She kept the $100 that was withheld and gave it to Hicks weekly. This practice continued from the time it was begun until sometime in 1951, when Evelyn became worried because of the income tax investigation that was being conducted. The practice was then discontinued and was not thereafter resumed. The money received by the firm was supposed to be deposited in a firm bank account. Expenses were paid by checks drawn on this account, *242 except that some minor expenses were paid by cash. The Lab kept no books. It had no bank account until October 1951. The fee for eye examination and glasses was usually lumped together. In some instances the patient would pay this amount in the Lab rather than in the doctor's office. The Lab would notify the office of this payment or might send the payment to the office. If a payment that included a fee for glasses was paid in the doctor's office it was sometimes entered in the usual manner on the patient-record card and entered in the cash book with a notation of the amount for glasses. In the other instances, the payments would be recorded on the patient-record cards and then sent to the Lab in order to give the Lab funds with which to pay expenses. In those cases they would not be entered on the cash book. The money that was received by the Lab was placed in a safe on the premises or in a safe-deposit box in a bank. Hicks had access to both, but there is no indication that he entered either of them. All local expenses were paid in cash and out-of-town expenses were paid by cashier's check or money order. Hicks advanced money to the Lab when it was short of funds with which to pay *243 expenses. Byrum repaid Hicks with cash from the safe-deposit box when there was sufficient cash on hand. No records were kept of the amounts that passed between them. If the Lab had an excess of cash after paying its bills, it was supposed to remit the money to the doctors' office. The manner in which the other doctors received their share of amounts that their patients paid the Lab for glasses varied from time to time. At one time, the other doctors were supposed to be credited with about $5 for each patient of theirs who purchased glasses and Hicks was to receive the remainder. Whatever amounts the other doctors received were recorded in the cash book when the Lab sent the money to the office. The other doctors were satisfied that they always received the amounts that were due them. In September 1949, a prescription register was opened and maintained by Evelyn and Elsie in the doctors' offices. It contained the patient's name, date of examination, and columns headed "paid" and "charged" for each doctor. Therein was supposed to be entered all of the sales of glasses made to the doctors' patients and whether they were paid or charged. In 1951, another column for repairs and sales to *244 outsiders was opened in that book. Evelyn and Elsie received the information to enter in the prescription register from someone in the Lab. The amounts in the paid column were paid in the Lab and would not be entered in the cash book of the firm since the firm did not actually receive the cash. The amounts in the charge column would be entered on the patient-record cards for the purpose of billing the patient. If the amount charged was subsequently paid in the doctors' offices it would be handled in the same manner as any cash receipt. At the end of each month, summary sheets were prepared in the doctors' offices. The expenses that were paid in cash were summarized and totaled. The expenses that were paid by check were summarized and totaled from the information on the check stubs. The amounts entered for each doctor in the cash book were totaled and the total receipts in the cash book were divided into the total for each doctor to arrive at his percentage of the total income. The cash balance in the bank at the end of the month was then divided among the doctors according to the percentage of income that they earned. Under this system each doctor received all of the fees that were *245 paid by his patients, less a percentage of the firm's expenses. That percentage was based on the ratio of his earnings to the total earnings of the firm. Prior to the years in question the doctors shared in the total earnings on the basis of a predetermined percentage. Partnership income tax returns were filed by the firm of doctors. The information for the returns was obtained from the monthly summary sheets. The total deposits were regarded as gross income, and the amount that each doctor received each month was regarded as his distributive share of the net income. The only income of the Lab that was reflected in the summary sheets and in the partnership returns was the amounts that had been sent from the Lab to the doctors' offices or receipts for Lab work that were collected in the doctors' offices and retained there. Except for a couple of years when there were discrepancies, Hicks reported as professional income on his individual return the amounts shown as his distributive share on the partnership return. A comparison of the partnership returns for the years involved with the returns of petitioner will disclose the following: Hicks
Distributive
Professional
Share Per
Income
Partnership
Reported
Year
Return
by Hicks
1940
$18,241.77
Unknown
1941
20,850.22
$20,850.22
1942
21,322.70
21,322.70
1943
23,347.17
21,049.87
1944
22,347.81
22,347.81
1945
25,597.99
25,597.99
1946
23,695.32
23,695.32
1947
22,025.72
22,025.72
1948
16,748.65
17,058.13
1949
Not shown
17,652.09
1950
17,744.20
17,744.20
1951
20,379.31
20,379.31
For *246 the years 1940 to 1949, all of the books and records of the firm were not available. The parties agree that the use of the net worth method is proper for those years. For the years 1950 and 1951, all of the above-mentioned records were available. Hicks' portion of the firm's income and the income of the Lab could be determined from the information contained in the records. 2. Years 1940 to 1949 Net Worth Method Most of the amounts included in the net worth computation of the respondent are stipulated as being correct and they are herein adopted. Findings with respect to those not stipulated as being correct are made below. (a) Cash on Hand Hicks had had a substantial income from his medical practice ever since he joined the firm. For most of the years it exceeded $10,000; in many of them it ranged between $15,000 and $20,000; and in some of the years it was more than $20,000. Hicks invested and speculated to some extent in various local businesses, real estate, stocks, and commodities. At one time he was a director of a building and loan association. He withdrew from the stock market prior to the 1929 crash. He withdrew all of his funds from the banks shortly before they closed in *247 1933. He put all of his cash in a safe-deposit box which he had rented in 1923. For a few years subsequent to 1933, he maintained no bank accounts but operated only out of a safe-deposit box. He has always been a frequent visitor to that box. For a while in the mid-1930's he was active in the stock market again. On December 31, 1939, the stipulation shows that Hicks had about $5,500 invested in the stock market and about $4,500 in cash in the bank. He had no other investments at that time except for his home and his interests in the medical firm and optical Lab. During the years in question Hicks entered his safe-deposit box to place cash therein and to withdraw cash. In September of 1951, Hicks voluntarily opened his safe-deposit box before the investigating agent and $11,910 was found therein. Prior to that the money in the safe-deposit box was not counted by Hicks, and no records were kept of amounts deposited therein or withdrawn. On December 31 of the following years Hicks had cash on hand, excluding the cash agreed upon, in the following amounts: Year
Amount
Year
Amount
1939
$40,000
1945
1940
40,000
1946
$ 5,000
1941
40,000
1947
10,000
1942
30,000
1948
15,000
1943
20,000
1949
20,000
1944
10,000
(b) Fedders-Quigan *248 Transactions Hicks became acquainted with Frank J. Quigan in 1945. Quigan had just gained control of Fedders Manufacturing Co. (became known as Fedders-Quigan in 1946) and was chairman of the board. Quigan advised Hicks that the stock of this corporation was increasing in value and would shortly split 5 for 1. He urged Hicks to purchase Fedders stock. Hicks purchased 1,100 shares of this stock at a cost of about $47,000. Shortly thereafter, the stock split 5 for 1. In 1946, Hicks sold 5,000 of the shares and realized a gain of over $33,000. Upon learning of the sale, Quigan called Hicks and expressed his disappointment in the fact that Hicks had sold. He requested that Hicks meet him in New York for a conference. They met in New York and they entered into an arrangement whereby stock would be purchased in Hicks' brokerage account, as directed by Quigan, and would not be sold unless Quigan approved. At the same meeting Quigan agreed to advance some cash to Hicks to help him purchase the stock and to bolster his financial position. Quigan also agreed to bear any loss up to the amount that he had advanced. Neither party was to reveal the existence or the terms of the agreement to other *249 persons. Hicks returned to Raleigh and purchased 5,000 shares of Fedders-Quigan stock and by 1951, 15,500 shares had been purchased in his accounts. Quigan frequently called Hicks' stockbroker and placed orders for Hicks' account. The broker would then call Hicks for confirmation. In 1948, Leonard M. Keats, an employee of Quigan, delivered $15,000 in cash to Hicks in Raleigh. Keats frequently delivered sums of money to other persons for Quigan. Keats delivered $10,000 in cash to Hicks in Raleigh in 1949. Also in 1949, Quigan gave $8,000 in cash to Hicks at a meeting in New York City. Hicks immediately turned it over to his stockbroker, Frank Moore, who was present at this meeting. In addition to the aforementioned amounts, Hicks received certain checks from Quigan in odd amounts, which represented differential payments on stock purchased. These amounts were determined by Quigan on the basis of the current selling price of the stock. Checks of the same nature were received by Hicks in 1950 also. The following schedule represents the dates and amounts of these checks: 1949
October 31, 1949
$2,541.40
December 6, 1949
309.38
December 31, 1949
2,040.77
Total
$4,891.55
1950
February 6, 1950
$3,393.59
May 18, 1950
3,720.00
June 9, 1950
2,189.00
Total
$9,302.59
In *250 1951, Keats delivered $5,000 from Quigan to Hicks. In 1949, Quigan caused Hicks to be named to the board of directors. Hicks and Quigan entered into written option agreements dated December 1, 1950 and January 2, 1951, each of which gave Hicks the right to purchase from Quigan personally, within 2 years, 10,000 shares of Fedders-Quigan stock at a price substantially below the then market price. Quigan was to tell Hicks when to exercise these options. The options were never exercised. In the spring or 1951, the price of Feders-Quigan stock reached 29 7/8. In May and June of 1951 the price declined sharply to about 11 1/2. The trading volume increased just as sharply. At that time the corporation's sales and net income before taxes were at an all time high. In June of 1951, Hicks ordered Moore to start selling his shares. After 600 shares were sold Quigan learned of the sales and ordered Hicks to stop selling. A short time later, Quigan lost his health and lost control of the corporation. He resigned as chairman of the board. Hicks then acted on his own and sold all of his shares except 100 shares that were required in order to remain on the board of directors. Following the collapse *251 of the stock, the S.E.C. investigated Quigan for his activities and for possible manipulation in buying and selling Fedders-Quigan stock in his own name and in the names of others. Hicks was among those questioned by the investigators. In the fall of 1951, Hicks visited Quigan in New York with the idea of straightening out their complex financial situation. John R. Peddy, Quigan's personal attorney, was present. Quigan advised Hicks that his own financial affairs were in a chaotic state at the time; that he was being investigated by the S.E.C., as well as for taxes, and for these reasons he desired to maintain the status quo with respect to these transactions with Hicks. Quigan further advised Hicks that he had discussed the matters with Peddy and other attorneys, and they had advised him that their transactions were loans and had no tax implications. Quigan died in July of 1952. Sol Masch, the attorney for the executrix of Quigan's estate, filed an estate tax return. No assets representing a receivable from Hicks and no liabilities representing a payable to Hicks were inventoried or listed. Masch did not know of any transaction with Hicks. Hicks' attorney met with Masch and spoke *252 of a possible amount that Hicks might owe the Quigan estate. The following computation was submitted to Masch: Checks from Quigan to Hicks
$14,194.14
Cash from Quigan to Hicks
35,000.00
Cash to brokerage account
8,000.00
Total indebtedness - Hicks to Quigan
$57,194.14
Less: Loss to Hicks on securities sold
49,523.36
Net amount due Quigan's estate by
Dr. Hicks
$ 7,670.78
On Hicks' 1951 return he showed an item "Deposit by Frank Quigan - $20,474.14." This amount was deducted from the cost of the Fedders-Quigan stock in determining the capital loss on the sale of that stock during that year. Hicks has never repaid Quigan or Quigan's estate any amounts. Hicks owed Quigan (or Quigan had an interest in the stock of Fedders-Quigan that was in Hicks' name) the following amounts on the following dates: December 31, 1948
$15,000.00
December 31, 1949
37,891.55
(c) Inventory In September 1951, Greig took a physical inventory of the material on hand in the optical Lab. The value of the inventory was $6,583.78. The value of the inventory on December 31 of the following years was as follows: Year
Amount
Year
Amount
1939
$2,500
1945
$4,500
1940
2,500
1946
4,500
1941
2,500
1947
5,500
1942
2,500
1948
5,500
1943
3,500
1949
6,500
1944
3,500
(d) *253 Living Expenses Hicks and his family lived in Raleigh, North Carolina, until 1945. In that year they purchased a home in Chapel Hill, which was about 35 miles away. Hicks lived at home but stayed in a room at a Raleigh hotel if he could not return home in the evening after work. In 1942, his son Greig entered the armed forces and did not live at home after that. In 1943, his son Vonnie, Jr., entered the armed forces and did not live at home after that. In 1947, his daughter Mary Jane was married and did not live at home after that. Hicks and his family took very few vacations. Hicks' main recreation was golf which he played once or twice a week. They had maids in their home until they moved to Chapel Hill and usually operated two automobiles. Hicks' bank statements were available for all of the years involved. Canceled checks or check stubs were available for the years 1945 to 1949. Hicks expended the following amounts for living expenses: Year
Amount
Year
Amount
1940
$7,500
1945
$ 7,350
1941
7,000
1946
11,000
1942
6,000
1947
10,500
1943
5,000
1948
10,000
1944
5,000
1949
9,000
(e) Wife's Income Hicks has maintained several brokerage accounts in his wife's name. He did all of the trading in them and has *254 received all of the proceeds that have resulted from sales, dividends, and interest. Jessie knew about these accounts in a general way but did not participate in handling the accounts or the securities that were purchased. Jessie had no independent income or money of her own. All the money that she received came from Hicks. Whatever she received was used for personal and living expenses. The assets in Jessie's name and the income derived therefrom belonged to Hicks. Jessie filed separate individual income tax returns for the following years which showed the following: Taxable Year
Net Income
Income Taxes
1941
$ 718.86
$ 69.01
1942
336.77
61.96
1943
84.21
1945
3,515.73
313.93
1946
16,507.80
4,943.70
1947
2,329.09
347.53
Jessie paid additional tax of $400 and $663.25 for the years 1945 and 1946, respectively. She personally never prepared any of the returns that she filed and did not have knowledge of their contents. However, she did sign the returns at the instance of her husband. 3. Years 1950 and 1951 The respondent has made certain specific adjustments to the income reported by the petitioners for the years 1950 and 1951. Some of these adjustments are not contested. Findings with regard to the adjustments *255 that are contested are made herewith: (a) Increase in Professional Income As determined by respondent in his notice of deficiency and alleged in his amended answer, petitioner's unreported professional income in 1950 and 1951 is composed of the following: Source
1950
1951
(a) Distributive share from
partnership
$ 778.77
(b) Income from Optical
Laboratory
16,840.73
$ 8,434.84
(c) Fees for professional
services
2,660.00
2,271.00
Totals
$20,279.50
$10,705.84
With respect to (a)a bove, distributive share from partnership unreported, apparently there is no dispute. No evidence was offered by petitioners tending to negate the correctness of respondent's determination. To the contrary, petitioners' accountant admits an understatement to the extent of $778.77. The records that were kept by the firm and the Lab for the years 1950 and 1951 were available and the investigating agents made a detailed audit of them. They also consulted third parties to obtain information relative to the Lab operation. The purpose of their audit and investigation was to determine the income of the Lab and to determine how much of the income was reported on the firm's books. Their analysis is embodied in the profit and loss statements *256 set out below: 1950
1951
Gross receipts:
$60,916.50
$59,712.55
Cost of goods sold: Beginning inventory
$ 6,500.00
$ 6,500.00
Purchases
19,687.49
24,362.79
$26,187.49
$30,862.79
Ending inventory
6,500.00
19,687.49
7,500.00
23,362.79
Gross profit
$41,229.01
$36,349.76
Gross profit
$41,229.01
$36,349.76
Expenses: Salaries and wages
$ 9,264.00
$11,528.00
Rent
850.00
1,407.89
Telephone
289.41
379.24
Depreciation
494.61
507.76
Office supplies and general expenses
2,000.00
12,898.02
2,151.88
15,974.77
Net profit
$28,330.99
$20,374.99
Less: Amount taken into account through part-
nership records: Dr. V. M. Hicks
$ 9,203.99
$ 9,167.05
Dr. John Wright - Fees
220.00
355.00
Dr. John Wright - Glasses
251.25
350.55
Dr. James Wright - Fees
1,035.00
1,135.00
Dr. James Wright - Glasses
780.02
11,490.26
932.55
11,940.15
Net profit unreported
$16,840.73
$ 8,434.84 The gross receipts consist of the totals of the paid columns for the three doctors in the prescription register, known cash receipts for Lab work that were not found to be recorded in the cash receipts book or the prescription register, and cash collected on outside work. For 1951, the latter figure was taken from the repair column in the prescription register. For 1950, the column for repair was not maintained *257 and the receipts from repairs were estimated. The inventories were estimates based on a physical inventory taken in September 1951. The purchases were computed from cashier's checks purchased from the banks and from the records of known suppliers. The specific expenses listed were computed in the same manner as the purchases. Depreciation was stipulated. Some of the items included in general expenses were obtained from third party records. The remainder was estimated since no records were kept of local expenses paid by cash. The amounts noted in the left-hand column of the cash book, that represented that part of the cash receipts which was for glasses, were deducted to arrive at the unreported net income of the Lab. The amounts so deducted were reported on the partnership returns. Since Hicks was the owner of the Lab, the income of the Lab, less the amounts given to the other doctors in the firm, belonged to Hicks. Hicks gave Evelyn and Elsie about $75 per month for helping to take care of the Lab's affairs. These amounts so paid are not listed as expenses on the profit and loss statement made by the respondent's agent. As we found previously, all receipts that were recorded in the *258 cash book, except for the petty cash items and some minor discrepancies, were deposited in the bank. On the partnership returns the total deposits were considered as gross income and the total of the checks drawn in favor of third parties for expenses was considered to be the firm's expenses. The balance in the bank, which was given to the doctors monthly, was deemed to be their distributive share of the firm's earnings. These payments to Evelyn and Elsie were not made by check; therefore, they were not included in the firm's expenses. In effect, the profit and loss statement made by the respondent's agent includes as gross receipts those receipts that were not included in the cash book. These payments, the total of which is $1,800 in 1950 and $1,800 in 1951, were paid by Hicks from what the respondent has determined to be the gross receipts of the Lab; therefore, the amounts are proper deductions from the Lab's gross income. Thomas Lilly, head of one of the largest optical firms in the southern part of the United States, was interested in opening a place in Raleigh. He knew Hicks and knew of the Lab since its inception. A preliminary survey of the Lab was made prior to 1949 by Lilly. *259 Lilly, in a discussion with Hicks in 1949, told Hicks that the Lab was not operating on a profitable basis and that the business would have to be expanded in order to make it profitable. In July 1952, Lilly sent a production man and an accountant to examine the Lab. They concluded that the Lab was not a profitable operation and Lilly's interest in acquiring the Lab ceased. The record does not show what records or factors were the basis of Lilly's determination that the Lab was unprofitable or what period the examination covered. The respondent has also increased Hicks' professional income by certain professional fees paid by check and not found to have been recorded in the cash receipts book, as follows: 1950
1951
Checks from individual patients
for treatment
$ 635
Checks from State Commission
for the Blind
2,025
$2,271
$2,660
$2,271 The checks from individual patients in the amount of $635 were deposited in the firm's bank account. (b) Checks received from Frank Quigan Respondent in his determination of the deficiency for 1950 included an item of $9,302.59 not reported by petitioners in their joint return which he described as follows: "(c) It has been determined that you received taxable *260 income in this year for services rendered Mr. Frank Quigan, for which you received $9,302.59. Inasmuch as you did not report income from this source, your net income for this year has been increased by $9,302.59." Hicks received $9,302.59 in checks from Quigan in 1950. (See finding with regard to Fedders-Quigan transactions, supra.) Hicks did not render any services to Quigan. This money was not given as compensation for services. Quigan gave Hicks this money so that Hicks could, in effect, purchase Feders-Quigan stock at a price lower than the current market price. The funds were to be used to indemnify Hicks against any loss that he might sustain on sale of the stock. Hicks was obligated to repay these amounts, less any loss on the sale of the stock, to Quigan. The $9,302.59 was not income to Hicks. 4. Dependency Exemptions Vonnie M. Hicks, Jr., Hicks' eldest son, returned from the armed services in 1946. He attended the University of North Carolina from 1946 until 1950, when he entered medical school in Philadelphia. During the years 1946 to 1950, he was married and also had children. During these years, Vonnie, Jr., was attending school on the G. I. Bill and receiving subsistence *261 allowances from the Government. Vonnie, Jr., had gross income of $522.25 in 1948, and $302.75 in 1947. His wife, Peggy, had gross income of $13.32 in 1948, and did not have any gross income in 1947. In 1946, their gross income was about the same as, or less than, it was in 1947. The above amounts of gross income were from sources other than Vonnie, Jr.'s subsistence allowance under the G. I. Bill. Vonnie, Jr., and his wife filed a Form 1040 jointly for the years 1946 to 1948, inclusive, for the purpose of obtaining a refund of taxes withheld from their wages. They paid no income taxes in any of those years and received refunds of $7.90, $12, and $22.70 in 1946, 1947, and 1948, respectively. The subsistence allowance that Vonnie, Jr., received was sufficient to support himself and Hicks did not furnish over one-half of his support. Hicks furnished over one-half of the support for Vonnie, Jr.'s wife, Peggy, for the year 1946. The Commissioner has not disallowed her as a dependency exemption for 1947 and 1948. 5. Additions to the Tax - Section 293(b) In addition to the previous Findings which may in one way or the other relate to this issue, we make the following additional Findings: *262 Barber Towler, an official of the Bureau of Internal Revenue prior to 1940, prepared the income tax returns of the petitioners for the years 1940 to 1948, inclusive. Bryson Biggs, a tax consultant, prepared the returns for the years 1949 to 1951 and the amended returns for the years 1947 and 1948. The professional income that Hicks reported on his returns agreed with his distributive share on the partnership returns, except for a couple of years when there were discrepancies. Neither Towler nor Biggs ever conducted an audit of Hicks' records or financial transactions and never conducted an audit of the firm's affairs but they had access to any records or information that they felt they needed. The returns were prepared from information submitted to them by Hicks or one of the secretaries in the office. They would analyze the information received and prepare the returns therefrom. Before the returns were filed Towler or Biggs would go over them with Hicks in a cursory manner. Towler and Biggs also prepared the partnership returns and the returns for the other doctors. Hicks was investigated previously by the Bureau of Internal Revenue for the years 1940 and 1946. Settlements were reached *263 both times. Biggs represented Hicks in regard to the audit for the year 1946. Biggs prepared amended returns for the years 1947 and 1948, incorporating the changes agreed upon for 1946. Hicks wanted Biggs to take the responsibility for filing correct returns in 1950 and 1951, since some of the errors of the earlier returns were due to the negligence of the person preparing the returns. Biggs agreed with Hicks to accept that responsibility. Dividend income in the amounts of $2,025 and $4,275 was omitted from the 1950 and 1951 returns, respectively. These amounts were paid in a broker's account in New York City and Biggs did not know about them. The omissions were due to the negligence of both Biggs and Hicks. There were other errors due to the negligence of Hicks and the person who prepared his returns in the other years. A part of the deficiency for the years 1941 to 1943 and for 1945 to 1947 is due to the fact that Jessie filed separate returns in those years and reported income that belonged to Hicks. Part of the deficiencies for each of the years 1947, 1948, 1949, 1950, and 1951 was due to fraud with intent to evade the payment of taxes. 6. Statute of Limitations The returns for *264 the years 1940 to 1948 were filed more than 3 years prior to the determination of the deficiencies. The returns for the years 1949 to 1951 were not filed more than 3 years prior to the determination of the deficiencies; or valid waivers of limitation of the period of assessment have been executed for those years. Petitioner's returns for 1947 and 1948 were false and fraudulent with intent to evade tax. Petitioner's returns for 1940 to 1946, inclusive, were not false and fraudulent with intent to evade tax and the statute of limitations bars the assessment and collection of the deficiencies for those years. 7. Estimated Tax Hicks' 1946 income tax return showed an overpayment of $2,954.15. On his 1947 return that amount was entered in the space captioned "By payments on 1947 Declaration of Estimated Tax." 8. Self-Employment Tax Hicks owned the Lab and was engaged in a trade or business. He was self-employed in 1951 and his income from self-employment was in excess of $3,600 in that year. Hicks' 1951 income tax return indicated that the self-employment tax was not computed or paid. Opinion BLACK, Judge: The issues involved herein will be discussed in the same order as the Findings of *265 Fact in regard to them. 1. Method of Determining Income The parties have agreed that the net worth method should be used to reconstruct the petitioners' net income for the years 1940 to 1949, inclusive. For the years 1950 and 1951, the records that were kept were available, but the accounting system was the same as in prior years except for the prescription register. The respondent has made specific adjustments to the petitioners' net income for those years, as reported in their returns, the major adjustment being designated as unreported professional income. The professional income was determined from the books and records kept by the firm and the Lab and from third party sources. The petitioner contends that the books and the system of accounting were inadequate and that the net worth method more nearly reflects the income; and that the changing of methods is inconsistent and tends to cause a doubling up of income (including the same income in 2 years). The choice of accounting method lies with the taxpayer, and when the method used clearly reflects his income the Commissioner cannot disregard it. Section 41, Internal Revenue Code of 1939. Here the method used does not clearly reflect *266 Hicks' professional income. The Commissioner could, therefore, disregard it. Louis Halle, 7 T.C. 245, 250 (1946), affd. 175 Fed. (2d) 500, certiorari denied 338 U.S. 949. However, he has not disregarded it for the 2 years, 1950 and 1951. He has recomputed the petitioner's income using the records as a basis, and, as has already been stated, made specific adjustments to the net income as reported by petitioners on their returns. The petitioner argues that the system and the records were inherently faulty and any computation based thereon would only perpetuate the original errors. The reason that the Commissioner has audited the records and made adjustments thereto for 1950 and 1951 is to correct the errors upon which the reported income was based. Of course, the Commissioner is bound to use a reasonable method. Cf. Bradstreet Co. of Maine v. Commissioner, 65 Fed. (2d) 943, 945 (C.A. 1, 1933). Here he determined the petitioner's income in the normal manner, i.e., taking the items that appear on the return and adjusting them in accordance with the facts as he claims he found them. As stated later, we do not agree with all of his adjustments but certainly his method cannot be held *267 to be unreasonable. The fear that the change from the net worth method to the specific adjustment method causes a doubling up of income for some of the years is illusory. Shifting of income between the years is possible when using the net worth method. If the exact date when an asset is acquired or a liability incurred is not known, that asset or liability might be wrongfully included or excluded in the net worth computation at the end of any year. And since the increase in net worth between the years is deemed to be income the wrongful inclusion or exclusion would cause the increase (or income) to be thrown into the wrong year. The specific adjustments of the income and deduction items do not require a consideration of assets and liabilities of the taxpayer. Since the assets and liabilities are not considered it is difficult to see how any income determined by the net worth method in 1949, the last net worth year, could be shifted into 1950, and thereby included twice. We, therefore, uphold the respondent in regard to the manner in which the income of the petitioner is to be determined. 2. Years 1940 - 1949 Net Worth Method (a) Cash in Safe-Deposit Box The respondent has established *268 Hicks' opening net worth at about $40,000, and no cash in a safe-deposit box is included in that figure. When the investigating agent asked Hicks to open his safe-deposit box at the inception of the investigation, $11,910 was found therein. Hicks kept no record of amounts in that box and had never counted it previously. He now claims that it contained in excess of $50,000 on December 31, 1939. His accountant attempted to compute the cash on hand at the end of the various years by adding to the known amount of $11,910 found in the box in 1951, the various expenditures for which checks could not be found and deducting cash received that could not be found to have been deposited in the bank. The amounts contained in the computation are not self-proving. Sitterding v. Commissioner, 80 Fed. (2d) 939, 941 (C.A. 4, 1936). Certain items that affect the computation, such as alleged receipts of $25,000 cash from Quigan in 1946 and 1947, were not found to be facts because of the lack of credible evidence. Therefore, we have not accepted that analysis as an accurate accounting of the facts. However, the facts do clearly show that Hicks kept substantial amounts of cash in his safe-deposit box *269 prior to and at the beginning of the first taxable year 1940, here in question. His income and investments in prior years, his business habits, his mode of living, and the small amount that he had invested on December 31, 1939, contradict a finding of no opening cash on hand. See Harry Gleis, 24 T.C. 941 (1955). The events that transpired and the balances in his bank account during the net worth period indicate that amounts on hand at the end of each year varied. We have, therefore, exercised our best judgment and discretion, based on all of the evidence before us, in finding the various amounts of cash on hand as set forth in our Findings. Cf. Cohan v. Commissioner, (C.A. 2) 39 Fed. (2d) 540. (b) Fedders-Quigan Transactions The petitioner claims that he received $107,194.14, including $92.891.55, through December 31, 1949, from Quigan and that if the Fedders-Quigan stock is to be shown as an asset these amounts should be shown as a liability since they were used to purchase the stock and they represented Quigan's interest in the stock. The respondent denies that Hicks received those amounts and contends that if he did receive them they were income to him since there was no unconditional *270 obligation to repay and should not be shown as a liability. We have found as a fact that Quigan advanced Hicks $15,000 in 1948 and $22,891.55 in 1949. The other amounts claimed have not been established by the weight of credible evidence. Of course, we have Hicks' testimony that he received the additional $55,000 through 1949, but that testimony is uncorroborated as to $50,000 and Keats' testimony was vague about the other $5,000. Peddy testified that he heard Hicks mention $100,000 during the course of the meeting at Quigan's home when there was an attempt to straighten out their financial affairs. But the other evidence tends to impeach the credibility of that testimony. Hicks' 1951 tax return shows a $20,474.14 deposit by Quigan in determining the capital loss on the sale of Fedders-Quigan stock in that year. Quigan's estate tax return shows no receivable due from Hicks. In a discussion with Masch, the attorney for Quigan's executrix, Hicks' attorney submitted a computation of the possible amount due. His computation showed about $57,000 as received from Quigan and a loss of $50,000 on the sale of the stock, with about $7,000 due from Hicks to Quigan. But the amounts that we have *271 found as having been received by Hicks in 1948 and 1949 should be given effect on the net worth statement. The facts are insufficient to determine the precise legal status of those funds, but it is clear they should be shown as liabilities or as a reduction of the cost of the Fedders-Quigan stock that is shown as an asset. The effect upon income will be the same if it is treated in either of the aforementioned ways. Our Findings can be given effect under Rule 50. (c) Inventories The respondent has included estimated inventories of the Lab as assets of Hicks in each of the years involved. The respondent has based his estimates on an actual inventory taken by Greig in September 1951, and on purported discussions with Greig and Byrum. Byrum could not recall the discussion and Greig was not called on to testify. The petitioner argues that the respondent's determination should not be deemed presumptively correct because it is arbitrary and made without knowledge on the part of the respondent and without any foundation in fact. We cannot agree. That type of business must have had inventories and the physical inventory taken in 1951 bears this out. However, we think that the respondent's *272 estimates in the beginning years are unrealistic. He has given Hicks credit for an inventory of $500 on December 31, 1939. It seems highly improbable that that type of operation could operate on so small an inventory. There are no records of any inventories except the one taken in 1951; therefore, we have based our finding on what would be reasonable with reference to the physical inventory taken in 1951, and to the type of business operation. (d) Living Expenses The parties are about $25,000 apart on living expenses. For the years 1945 to 1949, the differences are small. The canceled checks or check stubs and bank statements were available for most of those years and the differences result from different classifications of expenditures and differences over the amounts estimated for cash or out-of-pocket expenditures. For the prior years the checks and check stubs were not available. The respondent has made estimates based on subsequent years and on discussions with Hicks as to his mode of living. The petitioner's accountant has taken the total expenditures by check as shown by the bank statements and has deducted from that the expenditures that were nonliving expenses. He determined *273 those amounts by examining photostats of large checks and certain estimates. To the living expenses so determined, he has added estimated cash expenditures. Upon consideration of the computations of both parties and the other evidence relating to his mode of living and the number of persons that were living at home and dependent upon him in the various years, we have determined the living expenses as set forth in our Findings. (e) Wife's Income The respondent has included certain brokerage accounts that were maintained in Jessie's name among the assets of Hicks on the ground that they belonged to Hicks. Jessie filed separate returns for some of the years involved and reported the income from these accounts. These separate returns of Jessie are not directly involved since she is not a petitioner in Docket No. 53001. However, Hicks contends that the amounts reported by her should be deducted from the additional income determined to be his since the respondent has included in his net worth statement the assets from which the income reported by her was derived. We cannot agree. We found as a fact that those assets and the income derived therefrom belonged to Hicks and not to his wife, *274 Jessie. Undoubtedly, he could make a gift of the assets to Jessie. In that case we would not include them among his assets but would treat them as nondeductible expenditures. But Hicks has not done that. He has not given those assets away. He has retained them and the income derived therefrom as his own. The fact that Jessie returned that same income as her own does not prove that it was hers. Cf. T. J. Primm, 28 B.T.A. 13 (1933). The circumstances here are different from those in William G. Lias, 24 T.C. 280 (1955), affd. (C.A. 4, 1956) 235 Fed. (2d) 879, where the family group net worth method was approved. There the taxpayer's affairs and the ownership of the assets were so confused that the Commissioner combined all of the assets of his family for net worth purposes. In arriving at the understatement of income, the income reported by all of the family was deducted. Here there is no confusion over the ownership of these assets. It would no doubt seem equitable to allow Hicks to offset his tax liability with amounts erroneously paid by his wife but other remedies have been provided. See section 322, Internal Revenue Code of 1939. She is not a petitioner in Docket No. 53001 and *275 is not before the Court for the years in which she has filed separate returns. 3. Years 1950 - 1951 Specific Adjustments (a) Increase in Professional Income The respondent has added to Hicks' professional income the unreported net profit of the Lab and certain specific fees that were not found to be recorded in the cash receipts book. The unreported net income of the Lab was computed by making up profit and loss statements. The profit and loss statements are based on an audit of the records of the firm and the Lab and from information from third parties. The petitioner argues that profit and loss statements contain estimates and duplications and are in no way accurate. But he has not introduced any evidence to show that they are inaccurate. He has apparently taken the position that it is incumbent upon the respondent to prove the accuracy of the figures contained therein. The respondent's agent has testified as to how he arrived at the various amounts. We are convinced that the agent was diligent in his efforts to arrive at the income of the Lab. Cf. William G. Lias, supra. Furthermore, the respondent has come forward with a good deal of evidence to sustain his position. We, therefore, *276 uphold the respondent's determinations except as noted below. The testimony of Lilly that the Lab was not a profitable operation loses its force when there is no showing on what he based his conclusion. The volume of business the Lab was doing as shown by the prescription register, plus the business done with the various state agencies, renders the gross receipts figure credible. The expenditures were mostly derived from authoritative sources such as third party records. We have added $1,800 as expense in each year (1950 and 1951) to cover the amounts that Hicks paid to Evelyn and Elsie for helping with the Lab's affairs. The amounts are not included in the "salaries and wages" or the other expenses as set forth in the profit and loss statement nor were they recorded as expenses on the firm's partnership returns. They were paid from receipts included in gross income in respondent's profit and loss statement of the Lab. These additional expenses should be allowed as deductions in a recomputation under Rule 50. The amounts shown in the cash book (in the left-hand column) as being receipts for Lab work were deducted from the net income of the Lab, as shown on the profit and loss statement *277 prepared by the agent, to arrive at the unreported net income. The petitioner argues that if all of the amounts for Lab work that were received in the doctors' offices were not extended to the left-hand column, there would be a duplication, i.e., they would be reported on the partnership return since it was in the cash book, and would also be included in the Lab receipts since they were not extended to the left-hand column. What the petitioner says is true, but he has not shown where any duplication exists. Evelyn and Elsie testified that it was possible for them to make a mistake by failing to extend some amounts for Lab work to the left-hand column. The investigating agents testified that they made every effort to avoid duplication and we are convinced that any such duplication, if it does exist, is de minimis. The petitioner urges that the large net profits shown by the profit and loss statements are evidence of their incorrectness. However, we do not know what the net profit is until we compute it by some method. And if the method used is reasonable we should not disregard the conclusion reached unless it is incredible or unless there is some other evidence that might cause us *278 to doubt it. Here the net profit arrived at is credible; we accept it, there being insufficient evidence to overcome it. The petitioner lastly argues that the unreported net income of the Lab should not be attributed to him. Hicks was the owner of the Lab and responsible for its operation. His patients constituted a majority of the Lab's customers. The other doctors had nothing to do with the Lab except collect a fee for sending their patients there for glasses. They were satisfied that they received their fees. We sustain respondent's determination in attributing Hicks with the unreported income from the operation of the Lab. However, the net profits from the operation of the Lab, as determined by the respondent, will be diminished by allowing the additional expenses which we have held should be allowed. The respondent has also added certain specific fees to Hicks' professional income for 1950 and 1951. These fees were paid by check and were not found to have been recorded in the cash book. We found as a fact that of the amounts determined to be unrecorded in 1950, checks totaling $635 were actually deposited in the firm's bank account. Since these checks were actually deposited, *279 and since all of Hicks' drawings from the firm's bank account were reported as income, we hold that the $635 should not be added to Hicks' unreported income for 1950. The petitioner has not shown that amounts received by check from the State Commission for the Blind were included in his reported income. Accordingly, the respondent's determination regarding these amounts is upheld. (b) Amounts Received from Quigan in 1950 Hicks received checks in the amount of $9,302.59 from Quigan in 1950. These checks represented the difference between what Hicks paid for certain shares of Fedders-Quigan stock on the open market and the amount that Quigan wanted him to buy it for. The amounts were subject to the agreement whereby Quigan agreed to indemnify Hicks for any loss on the sale of his (Hicks') Fedders-Quigan stock up to the amount that he had advanced. The respondent has treated the $9,302.59 as "income for services rendered to Frank J. Quigan." The record shows that Hicks did not render any services to Quigan, and we have so found. The only thing that could be considered as a service would be that Quigan was using Hicks to help him (Quigan) control the market price of Fedders-Quigan stock. *280 But Hicks at the time did not know that Quigan was controlling the price of the stock. Furthermore, there was an obligation to repay Quigan unless a loss on the sale of the stock by Hicks exceeded all of the advances from Quigan to Hicks. The amounts received were advances subject to an indemnification agreement and should not be included in petitioner's net income. The respondent's determination is reversed. 4. Dependency Exemptions. The respondent disallowed 14 dependency exemptions for the years 1944 to 1950, inclusive. The only ones that are contested are for Vonnie, Jr., for the years 1946 to 1950, inclusive, and for his (Vonnie, Jr.'s) wife, Peggy, for the year 1946. Vonnie, Jr., was married and had children during this period. He was attending college on the G. I. Bill and was receiving subsistence allowances. In addition, he earned small amounts in some of the years. Hicks argues that Vonnie, Jr., should be allowed as an exemption since Vonnie, Jr., had a family and little income and since the record shows that he contributed practically full support to the family. It is clear that Hicks supported Vonnie, Jr.'s, family but it is also clear that Vonnie, Jr., received enough *281 to support himself and we found as a fact that Hicks did not contribute over one-half for his support. The respondent's determination in regard to Vonnie, Jr., is upheld. The respondent has disallowed Vonnie, Jr.'s, wife, Peggy, as a dependency exemption for the year 1946 on the gorund that she filed a joint return. [1] *282 The facts indicate that Vonnie, Jr., and Peggy had gross income of less than the amount required before a return is required to be filed. They were not required to report as gross income the subsistence allowance which Vonnie, Jr., received under the G. I. Bill. However, they filed a Form 1040 jointly in order to obtain their refund of $7.90 taxes withheld, rather than each filing a separate Form 1040 or a Form 843. The petitioner argues that this Form 1040 filed jointly by them was not a formal return but was a claim for a refund. The petitioner is correct in saying that the Form 1040 was a claim for a refund. But it was also a return. T.D. 5325, 1944-2 C.B., p. 152-153, which amended Regulations 111, section 29.322-2, dealing with claims for refund, in order to make it conform to the Current Tax Payment Act, provides, inter alia, that: "For taxable years beginning after December 31, 1942, a properly executed return on Form 1040 or Form 1040A shall, at the election of the taxpayer, constitute a claim for refund or credit within the meaning of section 322 for the amount of the overpayment disclosed by such return. For the purposes of section 322 such claim shall be considered as filed on the date on which such return is considered as filed. An election to treat the return as a claim for refund or credit shall be evidenced by a statement on the return setting forth the amount determined as an overpayment and advising whether such amount shall be refunded to the taxpayer or shall be applied as a credit against the taxpayer's estimated tax for the taxable year immediately succeeding the taxable year for which *283 such return is filed. * * *" This provision makes it clear that in order for a Form 1040 to be treated as a claim for refund it must also be a return. Since the Form 1040 that was filed jointly was a return, neither of the persons filing it can be claimed as a dependent by a third person. Section 25(b)(1)(C). Accordingly, respondent's determination as to Peggy is upheld. 5. Additions to the Tax Section 293(b) The respondent has determined that the petitioners are liable for the additions to the tax for fraud as provided for in section 293(b), Internal Revenue Code of 1939, for all of the years involved. The petitioners agree to a part of the deficiency for each year and maintain that they are the result of oversights on the part of Hicks or the persons who prepared his returns. He argues that the respondent has not met his burden to show fraud as required by section 1112 of the 1939 Code, which section reads as follows: "SEC. 1112. BURDEN OF PROOF IN FRAUD CASES. "In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner." In construing the above-quoted *284 statute, our Court and other courts have held that this burden which has been placed upon the Commissioner requires him to establish fraud by clear and convincing evidence. This rule was stated and emphasized by the court in the recent case of Goldberg v. Commissioner, (C.A. 5) 239 Fed. (2d) 316 (Dec. 19, 1956). The court, in that case, stated the rule as follows: "The fraud which the Commissioner was required to prove to sustain the penalty is actual and intentional wrongdoing with a specific intent to evade the tax. Mitchell v. Commissioner, 5th Cir. 1941, 118 Fed. (2d) 308. It is never imputed or presumed, and findings of fraud should not be sustained upon circumstances which at most create only suspicion. Olinger v. Commissioner, 5th Cir. 1956, 234 Fed. (2d) 823; Davis v. Commissioner, 10th Cir. 1950, 184 Fed. (2d) 86; Mitchell v. Commissioner, supra.* * *" Has the Commissioner, by clear and convincing evidence, proved that part of the deficiency in each of the taxable years which we have before us was due to fraud with intent to evade the tax? Undoubtedly, the books and records kept by the firm of doctors were inadequate to properly show income and deductions. It may *285 well be said that there was negligence on the part of these doctors, including Hicks, to keep proper and adequate records. We do not have any of the doctors before us except Hicks. There was no partnership between them; that seems to be conceded by both parties, although they did file partnership information returns. Apparently the amount of each doctor's share of the earnings as disclosed in these partnership returns was used as the basis for the returns which were filed. Certainly that was the case as to Hicks. Our Findings of Fact show that in all the taxable years before us he returned very substantial amounts of income. In most of the taxable years he returned in excess of $20,000 professional income as shown on the partnership returns. The instant case is not a case where the taxpayer over a considerable period of years returned for taxation inconsequential amounts of income and omitted large sums of income, which the record shows he had. Undoubtedly, in the instant case there were omissions of income in perhaps all of the taxable years, but in view of the adjustments we have made herein they will not be as large as the Commissioner has determined in his deficiency notices. While *286 it may well be said at the outset that in at least some of the years before us Hicks was negligent in ascertaining his correct net income, yet negligence alone, however great, does not establish proof of fraud. Mitchell v. Commissioner, 118 Fed. (2d) 308. In the Mitchell case the Fifth Circuit held that fraud means actual intentional wrongdoing and the intent required is the specific purpose to evade a tax believed to be owing. Mere negligence, whether slight or great, is not the equivalent of fraud. See also our decision on remand in William E. Mitchell, 45 B.T.A. 822. But in the instant case there is more than proof of mere negligence, at least as to some of the taxable years involved. Evelyn was called as a witness by the Commissioner and she testified quite at length. She was employed by the medical firm, which included Hicks, from 1939 until sometime in June 1953, when she quit of her own accord. During her period of employment her duties were general office work - secretarial and bookkeeping. She also acted as a receptionist. She testified unequivocably that at sometime after her employment Hicks requested that she take out each week $100 that was paid into the office by *287 Hicks' patients and make no record of it on the cash receipts book and turn it over to him at the end of the week. She testified that she complied with this request and turned over to Hicks the $100 a week, dating from the time it was requested until sometime in 1951, after the investigation of Hicks' tax liability began. After it was known that the tax investigation was under way, Evelyn testified that the practice was discontinued and was never thereafter resumed as long as she was there. When Evelyn testified about these payments to Hicks on direct examination, she was uncertain when they began. She testified as follows: "It seems to me it was about the same time that Mrs. Dunn came. I don't remember." The testimony of Elsie, who testified in rebuttal as a witness for petitioner, was to the effect that she came to work for the doctors in the latter part of 1941 and that her duties were similar to those of Evelyn and that she is still employed in the office of the doctors. In the light of Evelyn's testimony on direct examination that she thinks the payments may have begun about the time that Elsie came to work in the office, respondent asks us to make a finding of fact as follows: *288 "30. Around 1940 or 1941 Dr. Hicks gave Mrs. Lucier instructions to withhold 'about one hundred dollars' each week and not record the sums withheld in the cash receipts book." In the light of Evelyn's cross-examination we cannot make a Finding that it was around 1940 or 1941 that she received such instructions from Hicks. The following questions and answers appear in Evelyn's cross-examination by petitioner's counsel: "Q When did you receive these instructions to turn money over to him [Hicks]? "A I don't remember. * * *
"Q For how many years were you turning money over to him? "A I don't remember. "Q Was it for three years, four years, five years, after you came to work there or when was it? "A I don't know. I know it was not the whole time I was working there, but it was longer than 3 or 4 years. "Q How long was it? "A I don't remember. "Q Well, when you started to work there in 1940 were you turning money over to him? "A No. "Q Were you doing it when Byrum was there? "A Yes. "Q How many years? "A I don't remember." The testimony of Byrum was that he began working for the Lab in 1939, and continued to work there until sometime in 1948 when he discontinued his employment there and *289 went into the optical business in Raleigh for himself. It is clear that if we believe Evelyn's testimony that in some of the taxable years here involved she turned over to Hicks $100 a week from fees collected from his patients and of which no record was made, then there was fraud in Hicks' returns for those years. The attorney for Hicks in his brief does not contend that any such amounts were returned by Hicks as income. He argues strenuously that no such amounts were turned over by Evelyn to Hicks. It is true that Elsie testified that she never turned over any such funds to Hicks and that she did not see Evelyn turn over any such sums to him. Although he was in the courtroom throughout the testimony of Evelyn and heard her testify that she had turned over to him $100 a week in cash from fees collected from his patients and made no record of it, Hicks did not take the witness stand in rebuttal and make any denial of the truth of Evelyn's testimony. It is true that in his lengthy testimony as a witness, at the time of putting in his case, he denied any concealment of income of any kind but he did not testify in rebuttal of Evelyn's testimony, as he might have done. We heard all the *290 testimony and are convinced that during at least several of the years here involved Evelyn did hold out $100 a week of receipts from Hicks' patients and turned it over to Hicks, and that he did not include it in his income. In all such years it seems to us there can be no doubt that part of the deficiency for each of those years was due to fraud with intent to evade tax. After consideration of all the evidence, including Evelyn's testimony, we have made a Finding that part of the deficiencies in each of the years 1947, 1948, 1949, 1950, and 1951 was due to fraud with intent to evade the tax. The action of the Commissioner in determining the 50 per cent addition under section 293(b) of the 1939 Code for those years is sustained. We do not think that there is clear and convincing evidence that there was fraud on the part of petitioner for the other taxable years, and we have so found in our Findings of Fact. The additions to the tax imposed by the Commissioner for fraud in the taxable years 1940 to 1946, inclusive, are not sustained. 6. Statute of Limitations The petitioner has pleaded that the assessment and collection of the deficiencies for the years 1940 to 1948, inclusive, are *291 barred by the statute of limitations. Petitioners in their brief state, as follows: "Petitioners here concede that valid waivers were signed by them for each of the years 1949 and 1950 extending the period of assessment and collection and that the Statutory Notices of Deficiency were issued within that extended period. "The additional assessment proposed for the year 1951 was made within the regular three year period of limitation." Thus, we have no issue as to the statute of limitations for the years 1949 to 1951, inclusive. Based on the evidence, we have made a Finding that petitioners' returns for the years 1947 and 1948 were false and fraudulent with intent to evade the tax. That Finding means that the provisions of section 276(a) rather than the provisions of section 275, Internal Revenue Code of 1939, are applicable and the assessment and collection of the deficiencies for those years are not barred. Also, on the basis of the evidence, we have made a Finding that petitioner's returns for the years 1940 to 1946, inclusive, were not false and fraudulent with intent to evade the tax. That Finding means that the provisions of section 275 are applicable to those years and assessment *292 and collection of the deficiencies for those years are barred by the statute of limitations. We so hold. 7. Estimated Tax The respondent has also assessed the additions provided for in section 294(d)(1)(A), Internal Revenue Code of 1939, for the year 1947 and section 294(d)(2) of the 1939 Code relating to estimated taxes for the years 1943 to 1951, inclusive. From the record it appears that Hicks' 1946 return showed an overpayment of $2,954.15. On his 1947 return that amount is entered in the space captioned "By payments on 1947 Declaration of Estimated Tax." The petitioner has not introduced any evidence to show that he did file a declaration of estimated tax for 1947 or that his failure to so file was due to reasonable cause and not to willful neglect. The addition provided for in section 294(d)(1)(A) for the year 1947 is therefore proper. The additions provided for in section 294(d)(2) are conceded to be proper. However, the additions under both sections will have to be recomputed under Rule 50 due to the adjustments made to the respondent's other determinations. 8. Self-Employment Tax The respondent has determined that Hicks is liable for the self-employment tax imposed by sections 480 *293 and 481, Internal Revenue Code of 1939, printed in the margin, [2] for the year 1951. His 1951 return indicates that he has not paid this tax. The petitioner has not introduced any evidence on this point and the record clearly shows that he is the owner of the Lab and that he derived self-employment income of at least $3,600 therefrom, which is the amount the Commissioner has taxed. The respondent's determination is therefore sustained. Footnotes
1. Income and Victory Tax. SEC. 480. RATE OF TAX. In addition to other taxes, there shall be levied, collected, and paid for each taxable year beginning after December 31, 1950, upon the self-employment income of every individual, a tax as follows: (1) In the case of any taxable year beginning after December 31, 1950, and before January 1, 1954, the tax shall be equal to 2 1/4 per centum of the amount of the self-employment income for such taxable year. SEC. 481. DEFINITIONS. For the purposes of this subchapter - (a) Net Earnings From Self-Employment. - The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this chapter which are attributable to such trade or business, plus his distributive share (whether or not distributed) of the ordinary net income or loss, as computed under section 183, from any trade or business carried on by a partnership of which he is a member; * * *
(b) Self-Employment Income. - The term "self-employment income" means the net earnings from self-employment derived by an individual (other than a nonresident alien individual) * * * except that such term shall not include - (1) That part of the net earnings from self-employment which is in excess of: (A) $3,600, minus (B) the amount of the wages paid to such individual during the taxable years; or (2) The net earnings from self-employment, if such earnings for the taxable year are less than $400.
[2]↩ Includes increased deficiencies and additions claimed by amendment to answer in the amounts of $766.27 for 1950 and $62.34 for 1951.
1. The separate returns of Jessie are not directly involved since she is not a party in Docket No. 53001 covering the years 1940 to 1947, inclusive.↩
1. Internal Revenue Code of 1939: SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME. * * *
(b) * * * (1) * * * (C) An exemption of $500 for each dependent whose gross income for the calendar year in which the taxable year of the taxpayer begins is less than $500, except that the exemption shall not be allowed in respect of a dependent who has made a joint return with his spouse under section 51 for the taxable year beginning in such calendar year.↩